UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------------- X

MICAH LAKIN AVNI, individually, as personal
representative of the ESTATE OF RICHARD LAKIN,
and as guardian of Y.L, R.A., and V.A. (minors);
MANYA LAKIN, individually, as personal representative
of the ESTATE OF RICHARD LAKIN, and as guardian
of D.A.B. (minor); RITA AVNI, individually and as
guardian of E.A., R.A., and V.A. (minors); SHACHAR
BOTEACH;

STUART FORCE individually and as personal
representative of the ESTATE OF TAYLOR FORCE;
ROBBI FORCE; KRISTIN ANN FORCE;

MURRAY BRAUN; ESTHER BRAUN; SHIMSON
SAM HALPERIN; SARA HALPERIN; SHMUEL
ELIMELECH BRAUN individually and as personal
representative of the ESTATE OF C.Z.B. (minor);
CHANA BRAUN individually and as personal
representative of the ESTATE OF C.Z.B. (minor);

YITZHAK BEN-YISHAI and MIRIAM BEN-YISHAI,
individually and as representative of the ESTATE OF
SHOSHANA BEN-YISHAI, JACOB BEN-YISHAI,
ISRAEL BEN-YISHAI, CHANA BEN-YISHAI, YAEL
BEN-YISHAI, AVIEL BEN-YISHAI,

                         Plaintiffs,

                     -against-

UNITED STATES DEPARTMENT OF STATE;
ANTONY BLINKEN, in his official capacity as Secretary
of State; UNITED STATES DEPARTMENT OF
TREASURY; and JANET L. YELLEN, in her official
capacity as Secretary of the Treasury,

                         Defendants.

---------------------------------------------------------------------- X

23-CV _____ (___)

**COMPLAINT**

Jury trial demanded

Plaintiffs, by their undersigned counsel, complain of Defendants, and allege for their Complaint as follows:

## INTRODUCTION

1. Each of the Plaintiffs holds a judgment from a United States Federal Court against the Islamic Republic of Iran ("Iran") pursuant to § 1605(a)(7) and/or § 1605A of the Foreign Sovereign Immunities Act ("FSIA"). The aggregate amount of these judgments is $411,213,848.

2. Besides the Plaintiffs' judgments, there are over 15,700 victims of terrorism who are judgment creditors of Iran, holding judgments exceeding $100 billion.

3. These judgments are enforceable against the blocked assets of Iran, including the Central Bank of Iran and other Iranian financial institutions, pursuant to § 201 of the Terrorism Risk Insurance Act ("TRIA"). In passing TRIA, Congress expressed a clear policy in favor of broad enforcement of FSIA judgments against the blocked assets of terrorist parties, such as Iran. Under TRIA § 201, the term "blocked asset" includes "any asset with respect to which financial transactions are prohibited or regulated by the U.S. Treasury under any blocking order under the Trading With the Enemy Act, the International Emergency Economic Powers Act, or any proclamation, order, regulation, or license."

4. Accounts of the Central Bank of Iran and other Iranian financial institutions held in foreign bank accounts are subject to United States blocking sanctions pursuant to laws passed by Congress in 2010-2012. Such sanctions are to be lifted only if certain conditions are met, including that the President provides Congress with a certification that Iran no longer funds terrorism. Defendants, the Department of the Treasury and the Secretary of the Treasury are responsible for enforcing these blocking laws through the Office of Foreign Assets Control ("OFAC").

5.      Although the President was not able to certify to Congress that Iran ceased funding terrorism, a July 14, 2015 Joint Comprehensive Plan of Action dated (the "JCPOA") entered into between the United States, through Defendants the Department of State and the Secretary of State, the P5+1, and Iran, provided for the United States sanctions against these Iranian accounts, which contain $100 to $150 billion in accrued escrow funds, to be released upon implementation of the agreement. Thus, as a result of the JCPOA, the Plaintiffs lost one of the last remaining opportunities to the judgments against Iran.

6.      By allowing these billions of dollars in escrow funds to be released, the Executive Branch undermined both (i) the intent of Congress to allow Plaintiffs, who are victims of Iranian terrorism, to enforce their judgments against a broad range of blocked assets and (ii) Plaintiffs' judgments themselves, each of which was issued by a United States federal court.

7.      The United States withdrew from the JCPOA in May 2018.

8.      History is now repeating itself.

9.      In 2011, the Islamic Republic of Iran engaged in a scheme by which proceeds of sales of Iranian commodities, particularly oil, to South Korea were transferred to the Industrial Bank of Korea ("IBK") and Woori Bank, another South Korean bank, with the goal of converting Korean won ("KRW") denominated funds held in a restricted account belonging to the Central Bank of Iran at IBK to U.S. currency and funneling those funds into the U.S. financial markets in secret—thereby evading U.S. sanctions and depriving Iran's judgment creditors of hundreds of millions of dollars in recovery.

10.     Iran's evasion of U.S. sanctions was orchestrated through the transfer of approximately $7 billion to and through IBK's New York branch ("IBKNY") in bad faith, by falsifying documents and business relationships to enable the transfer of otherwise-restricted Iranian funds in the Central Bank of Iran's account at IBK and Woori Bank to other participants

in the fraudulent scheme, in the hope of evading U.S. sanctions. The transfers at issue were made while Plaintiffs—the victims of acts of terrorism sponsored by Iran—and numerous other terror victims similarly situated had massive judgments against Iran.

11.    Transfers of Iran's funds were made with knowledge of Plaintiffs' judgments and with the intent of circumventing judgments in those cases and U.S. laws designed to capture Iranian funds, including funds that, had the true beneficiary of which been disclosed, could have been subject to attachment and seizure by Plaintiffs and other victims of Iranian-sponsored terrorism.

12.    Iran is the world's leading sponsor of terrorism and an unrepentant judgment debtor. It owes over $100 billion to judgment creditors in the United States, all of whom are victims of terrorism and their families, whose lives were forever altered by Iran's terrorist attacks against the United States.

13.    Iran remains one of the world's biggest economies, with its gross domestic product amounting to over $1 trillion, billions of which pass through the international financial markets, including the U.S. financial markets, each year. If detected in the U.S. financial system, however, Iran's assets could have been used to satisfy the terror victims' judgments

14.    Having litigated against U.S. judgment creditors—who have sought for decades to enforce their judgments for Iran's support of terrorism resulting in their injuries—Iran was well-aware of the danger that its funds would be seized by judgment creditors such as Plaintiffs unless elaborate subterfuge was successfully employed.

15.    To evade detection and its debts to terror victims like the Plaintiffs, Iran and its agents worked with IBK and Woori Bank to develop a fraudulent conveyance scheme involving complex, fraudulent transactions that masked the flow of funds that Iran caused to be transferred to restricted accounts at IBK and Woori Bank into and out of the U.S. financial markets, and the

New York banking system. Through these fraudulent transactions, Iran transferred or caused to be transferred over $7 billion worth of its funds to and through its bank accounts at IBK and Woori Bank to Korean entities' accounts within IBK and Woori Bank. These transfers were made possible through an agreement between Iran, its agents, and senior officials at IBK and Woori Bank that IBK and Woori Bank would authorize the transfers, which were based entirely on fake documents and sham transactions, to go forward, and that IBK and Woori Bank would knowingly execute subsequent transfers for the benefit of Iran.

16.     Through this carefully calculated deception, between February 2011 and at least July 2011, approximately $7 billion worth of Iranian assets were fraudulently conveyed to accounts at IBK and Woori Bank, evading execution by Plaintiffs. Not only did this allow Iran to evade its debts to Plaintiffs, it also allowed Iran to circumvent the U.S. Iranian sanctions regime, which was designed and implemented specifically to exclude Iran from the U.S. financial system and capital markets. Indeed, in order to successfully execute this fraud, IBK and Woori Bank flouted U.S. banking regulations and intentionally withheld information from U.S. regulators on behalf of Iran.

17.     The aforementioned $7 billion then remained blocked at the South Korean banks because those banks are required to comply with United States sanctions programs.

18.     As a result of the United States sanctions programs freezing those assets, these funds cannot be released without the consent of the United States government.

19.     In or about August 2023, the United States government, as part of negotiations for concessions from Iran, including release of certain political prisoners or hostages being held by Iran, has indicated its intent to unblock the $7 billion of assets and allow them to be transferred to Iran.

20.     The course of conduct which the United States Government has announced will have the effect of thwarting the ability of judgment creditors of Iran to pursue turnover of the $7 billion in IBK and Woori Bank.

21.     Indeed, 323 judgment terror-victim judgment creditors of Iran recently attempted to obtain turnover of the assets at IBK through litigation in the Southern District of New York, but were ordered to pursue that case in the courts of South Korea. *Wamai v. Indus. Bank of Korea*, No. 21-cv-325 (DLC), 2021 U.S. Dist. LEXIS 131240 (S.D.N.Y. July 14, 2021), aff'd *Wamai v. Indus. Bank of Korea,* No. 21-1956-cv, 2023 U.S. App. LEXIS 3689 (2d Cir. Feb. 16, 2023). It is unclear what is the status of those judgment-creditors' enforcement efforts in South Korea, but it is certainly clear that if the assets are allowed by the United States to be released to Iran the ability of all judgment-creditors to enforce their judgments against these assets will be thwarted.

22.     While the United States government certainly has the authority to conduct the foreign policy of the United States, that foreign policy should not be conducted on the backs of terror victims. Congress has created statutes allowing terror victims to sue foreign state sponsors of terrorism for the grievous damages they have suffered as a result of terrorist attacks, and Congress has provided that those judgments are enforceable against blocked assets of foreign state sponsors of terrorism. When the United States government releases assets which have been blocked to Iran, the United States government does so at the direct expense of terror victim judgment creditors such as the Plaintiffs.

23.     Terror victim judgment-creditors have all already suffered when they and their family members were victimized by terrorists—victimization which often takes place because they are American. The victims having already paid the price, it is unseemly and unfair for the United States government to give away to Iran assets that were potentially reachable by them the terror victims to enforce their judgments.

-6-

24.     If the government of the United States of America has determined—however wisely or unwisely—that it is in the national interest to pay $7 billion of blocked assets to Iran, that burden should be borne by the country as a whole, and not by individual terror victims.

25.     Defendants have a duty to these Plaintiffs not to let these billions of dollars disappear from their judgment enforcement reach thereby inhibiting Plaintiffs' ability to enforce their judgments against Iran.

26.     By this action, Plaintiffs seek to enjoin the release of these $7 billion of dollars to Iran so long as the judgments of terror victims against Iran remain unsatisfied. In the alternative, if the United States government goes ahead and releases this $7 billion to Iran, the United States government should be required to contribute a like amount to paying down the judgments of judgment-holding victims of Iranian terrorism.

27.     Moreover, according to media reports there are more than $100 billion dollars in additional Iranian assets being frozen pursuant to sanctions worldwide. Iran's central bank maintains accounts in numerous countries including Japan, Iraq, China, Germany, India, Turkey, and the United Arab Emirates, as well as South Korea. These countries have frozen the frozen funds and refused to process Iran-related transactions in compliance with the United States' sanctions regime. As such, the United States is in a unique position to greenlight the release of Iranian funds or require them to remain frozen globally.

<u>**JURISDICTION AND VENUE**</u>

28.     This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, § 1346(a)(2) and § 1361.

29.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e).

## THE PARTIES

30.     Plaintiff Micah Lakin Avni, at all times relevant hereto, is and was a U.S. citizen domiciled in Israel and the son, heir and personal representative of the estate of decedent Richard Lakin, who was murdered by Hamas operatives on October 13, 2015. Plaintiff Micah Avni brings this action individually, as personal representative of the Estate of Richard Lakin, and as parent and natural guardian of Y.L, R.A., and V.A., minors who are the grandchildren of decedent Richard Lakin. At all times relevant hereto, decedent Richard Lakin was a U.S. citizen.

31.     Plaintiff Manya Lakin, at all times relevant hereto, is and was a U.S. citizen domiciled in Israel and the daughter, heir and personal representative of the Estate of Richard Lakin. Plaintiff Manya Lakin brings this action individually, as personal representative of the Estate of Richard Lakin, and as parent and natural guardian of D.A.B, a minor and grandson of decedent Richard Lakin.

32.     Plaintiff Rita Avni is the wife of plaintiff Micah Lakin Avni and the daughter-in-law of decedent Richard Lakin, and brings this action individually and as parent and natural guardian of E.A., R.A., and V.A., minors. R.A. and V.A are the grandchildren of decedent Richard Lakin and E.A. is the step-granddaughter of decedent Richard Lakin. At all times relevant hereto, Plaintiff Rita Avni is and was an Israeli citizen domiciled in Israel.

33.     Plaintiff Shachar Boteach is the daughter of Plaintiff Manya Lakin, and granddaughter of decedent Richard Lakin. At all times relevant hereto, Plaintiff Shachar Boteach is and was a U.S. citizen domiciled in Israel.

34.     The minor D.A.B., at all times relevant hereto, is and was a U.S. citizen domiciled in Israel.

35.     The minor Y.L., at all times relevant hereto, is and was a U.S. citizen domiciled in Israel.

36.     The minors R.A. and V.A., at all times relevant hereto, are and were Israeli citizens.

37.     The minor E.A., at all times relevant hereto, is and was an Israeli citizen domiciled in Israel.

38.     Plaintiffs Micah Lakin Avni, individually and on behalf of the Estate of Richard Lakin, Manya Lakin, Rita Avni, Shachar Boteach, Y.L., R.A., V.A., E.A., D.A.B., hold a judgment against the Islamic Republic of Iran in the aggregate amount of $54,977,496, *see Force v. Islamic Republic of Iran,* 617 F. Supp. 3d 20 (D.D.C. 2022)

39.     Plaintiff Stuart Force at all times relevant hereto, is and was a U.S. citizen domiciled in South Carolina and the father, heir and personal representative of the estate of decedent Taylor Force, who was murdered by a Hamas operative on March 8, 2016. At all times relevant hereto, decedent Taylor Force was a U.S. citizen. Plaintiff Stuart Force brings this action individually and on behalf of the Estate of Taylor Force.

40.     Plaintiff Robbi Force at all times relevant hereto, is and was and was a U.S. citizen domiciled in South Carolina and the mother of decedent Taylor Force.

41.     Plaintiff Kristin Ann Force at all times relevant hereto, is and was and was U.S. citizen and the sister of decedent Taylor Force.

42.     Plaintiffs Stuart Force, individually and as the representative of the Estate of Taylor Force, Robbi Force, and Kristin Ann Force hold a judgment against the Islamic Republic of Iran in the aggregate amount of $66,189,012, *see Force v. Islamic Republic of Iran,* 617 F. Supp. 3d 20 (D.D.C. 2022).

43.     Plaintiffs Murray Braun, Esther Braun, Shimson Sam Halperin, and Sara Halperin, at all times relevant hereto are and were citizens of the United States domiciled in Israel, and the grandparents of decedent C.Z.B.

44.     Plaintiffs Shmuel Elimelech Braun and Chana Braun at all times relevant hereto are and were the parents, heirs and personal representatives of the estate of their minor daughter, C.Z.B., who was also a citizen of the United States on October 22, 2014 when she was killed by a Hamas terrorist. Plaintiffs Shmuel Elimelech Braun and Chana Braun, at all times relevant hereto, are and were citizens of the United States domiciled in Israel. They each bring claims individually, and as joint administrators of the Estate of C.Z.B.

45.     Plaintiffs Murray Braun, Esther Braun, Shimson Sam Halperin, Sara Halperin and Shmuel Elimelech Braun and Chana Braun, individually and on behalf of the Estate of C.Z.B., hold a judgment against the Islamic Republic of Iran in the aggregate amount of $178,500,000, *see Braun v. Islamic Republic of Iran*, 228 F. Supp. 3d 64 (D.D.C. 2017).

46.     Plaintiff Miriam Ben-Yishai, the mother of Shoshana Ben-Yishai, is an American citizen. Plaintiff Yitzhak Ben-Yishai is an American citizen and the father of Shoshana Ben-Yishai. They are the parents, heirs and personal representatives of the estate of decedent Shoshana Ben-Yishai, who was murdered in a terrorist drive-by shooting on November 4, 2001. They bring this civil action individually and jointly as administrators of the Estate of Shoshana Ben-Yishai.

47.     Plaintiff Jacob D. Ben-Yishai, is an American citizen and the brother of the decedent Shoshana Ben-Yishai.

48.     Plaintiff Israel Ben-Yishai, is an American citizen and the brother of the decedent Shoshana Ben-Yishai.

49.     Plaintiff Chana Ben-Yishai is an American citizen and the sister of the decedent Shoshana Ben-Yishai.

50.     Plaintiff Yael Ben-Yishai, is an American citizen and the sister of the decedent Shoshana Ben-Yishai.

51.     Plaintiff Aviel Ben-Yishai, is an American citizen and the brother of the decedent Shoshana Ben-Yishai.

52.     Plaintiff Miriam Ben-Yishai, individually and as the representative of the Estate of Shoshana Ben-Yishai, Yitzhak Ben-Yishai, individually and as the representative of the Estate of Shoshana Ben-Yishai, Jacob D. Ben-Yishai, Israel Ben-Yishai, Chana Ben-Yishai, Yael Ben-Yishai, and Aviel Ben-Yishai, hold a judgment against the Islamic Republic of Iran in the aggregate amount of $111,547,340, *see Ben-Yishai v. Syrian Arab Republic,* No. 1:18-cv-3150-RCL, 2022 U.S. Dist. LEXIS 213752 (D.D.C. Nov. 28, 2022).

53.     Defendant United States Department of State is a federal agency responsible for foreign affairs, whose chief administrator is the Secretary of State. In carrying out its responsibilities, the Department of State must comply with applicable requirements of the Comprehensive Iran Sanctions, Accountability, and Divestment Act of 2010 ("CISADA"), as modified by the Iran Threat Reduction Act of 2012 ("ITRA") and the National Defense Authorization Act FY2012 ("NDAA FY 2012"), as modified by ITRA.

54.     Defendant Antony Blinken is the Secretary of State. In his capacity, Secretary Blinken is the President's chief of foreign affairs and is responsible for carrying out the President's foreign policies. In his official capacity, Defendant has been directly involved with the negotiations to pay the $7 billion to Iran. In carrying out his duties, Secretary Blinken must ensure compliance with CISADA, NDAA FY2012 and ITRA.

55.     Defendant United States Department of Treasury is a federal agency responsible for administering and enforcing the economic and trade sanctions against Iran through the OFAC. In carrying out its responsibilities, the Department of Treasury must comply with applicable requirements of CISADA, NDAA FY2012 and ITRA.

56.     Defendant Janet L. Yellen is the Secretary of Treasury. Secretary Yellen is responsible for implementing the sanctions against Iran through OFAC. In carrying out these duties, Secretary Yellen must ensure compliance with CISADA, NDAA FY2012 and ITRA.

## FACTS

### A.     The Plaintiffs' Rights to Enforce Their Judgments

57.     Each of the Plaintiffs is the victim of a terror attack sponsored by Iran, carried out through one of its terrorist proxies in the Middle East.

58.     Each of the Plaintiffs holds a judgment against Iran from a United States Federal District Court pursuant to the terrorist exception to the FSIA – formerly 28 U.S.C. §1605(a)(7), now codified as 28 U.S.C. §1605A – which divests foreign states of immunity for carrying out or providing material support for acts of terrorism.

59.     Plaintiffs are entitled to enforce their judgments against the blocked or frozen assets of Iran pursuant to, *inter alia*, the Terrorism Risk Insurance Act ("TRIA") § 201.

60.     TRIA § 201 was legislated by Congress in 2002 to facilitate the enforcement of judgments, like those held by Plaintiffs, against state sponsors of terror – "to deal comprehensively with the problem of enforcement of judgments issued to victims of terrorism in any U.S. court by enabling them to satisfy such judgments from the frozen assets of terrorist parties." 148 Cong. Rec. S11528 (daily ed. Nov. 19, 2002) (statement of Sen. Harkin).

61.     TRIA § 201 provides in relevant part:

*Notwithstanding any other provision of law*, and except as provided in subsection (b), in every case in which a person has obtained a judgment against a terrorist party on a claim based upon an act of terrorism, or for which a terrorist party is not immune under section 1605A or 1605 (a)(7) ... of title 28, United States Code, *the blocked assets of that terrorist party* (including the blocked assets of any agency or instrumentality of that terrorist party) shall be subject to execution or attachment....

TRIA § 201(a) (emphasis added).

62.    The term "blocked asset" is defined as "any asset seized or frozen by the United States under section 5(b) of the Trading With the Enemy Act (50 U.S.C.App. § 5(b)) or under sections 202 and 203 of the International Emergency Economic Powers Act (50 U.S.C. §§ 1701–1702)." TRIA § 201(d).

63.    According to the legislative history of the TRIA:

the term 'blocked asset' has been broadly defined to include any asset that has been seized by the United States in accordance with law ... includ [ing] any asset with respect to which financial transactions are prohibited or regulated by the U.S. Treasury under any blocking order under the [TWEA], the [IEEPA], or any proclamation, order, regulation, or license," and excepting only assets to which the United States claims ownership.

148 Cong. Rec. S11528 (daily ed. Nov. 19, 2002) (statement of Sen. Harkin) (emphasis added).

64.    Over the years, Plaintiffs have attempted, with mixed success, to enforce their judgments against a variety of blocked or frozen assets of Iran in the United States. *See, e.g.*, *Rubin v. Iran*, 33 F. Supp. 3d 1003 (N.D. Ill. 2014) (Iranian antiquities on loan to University of Chicago not blocked); *Rubin v. Iran*, 709 F.3d 49 (1st Cir. 2013) (Iranian antiquities in United States not blocked assets); *Ministry of Defense and Support for Armed Forces of Islamic Republic of Iran v. Cubic Defense Systems*, 984 F. Supp.2d 1070 (S.D. Cal. 2013) (permitting attachment of arbitral award in favor of Iranian Ministry of Defense); *Weinstein v. Iran*, 609 F.3d 43 (2d Cir. 2010 (receiver could be appointed to sell property owned by Iranian bank); *Bank of New York v. Rubin*, 484 F.3d 149 (2d Cir. 2007) (holding that bank assets sought to be attached were not "blocked" assets). In some of these cases Iran has actively litigated against Plaintiffs' judgment enforcement efforts. To date, the vast majority of Plaintiffs' judgments remain outstanding.

65.    Most recently, Plaintiffs commenced an investigation into blocked assets of the sanctioned Central Bank of Iran held by certain third party foreign banks with the intent of enforcing their judgments against these accounts. However, because these blocked assets are

located outside of the United States, Plaintiffs faced obstacles in obtaining discovery with respect to the accounts.

**B.      Sanctions Against Iran**

66.     Since 1984 until the present time, Iran has been continuously designated by the United States Department of State as a state sponsor of terrorism pursuant to Section 6(j) of the Export Administration Act of 1979 (50 U.S.C. § 2405(j)).

67.     From 1979 and until today, Iran has been continuously linked to terrorist attacks around the world.

68.     Iran is known to support various terrorist groups active in the Middle East, such as Hezbollah, Hamas and Palestine Islamic Jihad, all of which have carried out numerous deadly attacks against civilians, including the attacks in which Plaintiffs were harmed. Iran also supports the regime of Syrian President Bashar al-Assad, Iraqi Shia militants and the Houthis in Yemen and provides safe haven to senior al-Qaeda members.

69.     According to the State Department's 2013 report on terrorism, "Iran used the Islamic Revolutionary Guard Corps-Quds Force ("IRGC-QF") and its regional proxy groups to implement its foreign policy goals, provide cover for intelligence operations, and create instability in the Middle East." IRGC is known to provide training and financing to terrorist operatives.

70.     Iran has been subject to economic and trade sanctions in some form since the 1979 Islamic Revolution and hostage crisis and the October 1983 bombing of the U.S. marine base in Lebanon.

71.     These sanctions have been expanded in recent years pursuant to the Comprehensive Iran, Sanctions, Accountability, and Divestment Act of 2010 ("CIASDA") as modified by the ITRA and the NDAA FY 2012, as modified by ITRA. The sanctions are directed towards Iran's role in terrorist financing and its nuclear expansion efforts.

72.     The United States sanctions against Iran include financial and banking sanctions pursuant to which U.S. based institutions are prohibited from having financial dealings with Iranian financial institutions and foreign based financial institutions or subsidiaries that deal with sanctioned banks are barred from conducting business in the United States or with the U.S. Dollar. The sanctions have the effect of freezing Iranian assets all over the world, including many international bank accounts and banking transactions.

73.     Among other Iranian financial institutions, the Central Bank of Iran has been, since 2012, a primary target of U.S. sanctions, which include blocking of property and restrictions and prohibitions on financial transaction and the exportation of property.

74.     In 2011, Defendant, the Department of the Treasury made a Section 311 PATRIOT Act finding that the entire "Islamic Republic of Iran is a jurisdiction of primary money laundering concern" due to its support for terrorism, pursuit of weapons of mass destruction and the illicit and deceptive financial activities of its financial institutions. The Department of the Treasury specifically targeted the Central Bank of Iran, making clear that the country's entire financial system posed "illicit finance risks for the global financial system." The Central Bank of Iran is the main financial conduit for the full range of Iran's illicit activities.

75.     Based on that Section 311 Patriot Act finding, Congress enacted Section 1245 of the National Defense Authorization Act (NDAA) of FY2012, as amended by Section 504 of the ITRA, which provides for sanctions against foreign financial institutions conducting transactions with the Central Bank of Iran and other Iranian financial institutions subject to United States sanctions. Congress has provided that these sanctions shall terminate if the President submits a certification to Congress that, *inter alia*, "the Government of Iran has ceased providing support for acts of international terrorism and no longer satisfies the requirements for designation as a state sponsor of terrorism." CISADA Section 401, cited as 22 U.S.C. § 8551(a)(1) .

76.    In connection with the Section 311 Patriot Act finding, Iran was also removed from the SWIFT (Society for Worldwide Interbank Financial Telecommunication) global payments system in 2012.

77.    As a result of the above sanctions, Iran has been isolated from the international banking system and international markets leading to devastating effects on Iran's trade and commerce.

78.    While the sanctions have been successful in constricting Iran's economy and limiting its ability to procure military equipment, Iran continues to finance and support terrorism.

## COUNT I
## PURSUANT TO MANDAMUS ACT 28 U.S.C. § 1361

79.    The allegations set forth in the preceding paragraphs are incorporated by reference as though fully set forth herein.

80.    Pursuant to TRIA § 201, Plaintiffs have the right to enforce their judgments against all blocked assets of Iran, including the Central Bank of Iran accounts held in foreign financial institutions that are to be released from IBK and Woori Bank.

81.    Defendants have a duty to the Plaintiffs not to hinder their ability to enforce their federal judgments.

82.    Further, by unblocking or otherwise lifting sanctions against the accounts at issue, thereby preventing Plaintiffs from being able to enforce their judgments against Iran, Defendants will be undermining Plaintiffs' federal judgments and the Congressional intent expressed in TRIA § 201 that Plaintiffs should have broad judgment enforcement capabilities.

83.    To the extent there is any conflict between Plaintiffs' ability to enforce their judgments under TRIA § 201 and the decision of the Executive to relieve sanctions against Iran, TRIA § 201 should prevail, as the language of TRIA § 201 provides "Notwithstanding any other provision of law," which is intended to supersede other laws.

84.    Depriving Plaintiffs of the ability to enforce their judgments constitutes an unconstitutional taking without just compensation in violation of the Fifth Amendment.

85.    Plaintiffs will suffer irreparable injury unless Defendants are compelled to leave the sanctions in place until the compensatory damages portions of Plaintiffs' judgments are collected in full.

86.    This Court has jurisdiction and authority to grant the requested relief pursuant to 28 U.S.C. § 1361.

## COUNT II
## INJUNCTION

87.    The allegations set forth in the preceding paragraphs are incorporated by reference as though fully set forth herein.

88.    The sanctions against the Central Bank of Iran and other Iranian financial institutions should remain in place until Plaintiffs' judgments against Iran are paid in full.

89.    Iran has steadfastly refused to satisfy these judgments. Even more, Iran has actively litigated to prevent some of Plaintiffs' judgment enforcement efforts against Iranian assets located in the United States.

90.    To date, only a tiny fraction of Plaintiffs' judgments has been collected. While Plaintiffs continue to search for blocked Iranian assets against which they may enforce their judgments pursuant to TRIA § 201, Iran remains a designated state sponsor of terror and continues to spend billions of dollars on terrorism.

91.    Implementation of United States government's plan to release the $7 billion from IBK and Woori Bank absent the requested injunctive relief will directly and irreparably harm Plaintiffs' ability to collect their judgments, particularly with respect to the Central Bank of Iran accounts held in foreign financial institutions which until now have been blocked and, therefore, subject to enforcement under TRIA § 201.

92.     Granting the requested relief is in the public interest as expressed by Congress in its statutes. Specifically, in passing TRIA § 201, Congress expressed a policy and intent favoring broad enforcement of judgments against state sponsors of terrorism. Further, in the statutes pursuant to which the aforementioned accounts are blocked (NDAA FY 2012 § 1245, ITRA § 504 and CISADA § 401), Congress expressed a policy and intent that such sanctions should be lifted only if specific conditions are satisfied, which include a certification by the President that Iran is no longer a financier and sponsor of terror. That terrorism condition has not been satisfied. Iran remains a designated state sponsor of terror and continues to fund terrorism.

93.     The balancing of harms clearly favors entry of an injunction. While Iran is poised to receive $7 billion in sanctions relief through the United States government's intended actions, notwithstanding its continued support for terrorism, the Plaintiffs–victims of Iranian terrorism–damages judgments remain outstanding. Plaintiffs' judgments should be satisfied out of the frozen funds set to be released to Iran, or out of other money to be paid by the United States itself if the United States insists on releasing the blocked funds to Iran.

94.     Plaintiffs have no adequate remedy at law.

## COUNT III
## Violation of the Takings Clause

95.     The allegations set forth in the preceding paragraphs are incorporated by reference as though fully set forth herein.

96.     The Takings Clause of the Fifth Amendment provides that private property shall not "be taken for public use, without just compensation." U.S. Const. Amend. V.

97.     The Takings Clause "is designed not to limit the governmental interference with property rights *per se,* but rather to secure *compensation* in the event of otherwise proper interference amounting to a taking." *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 536–37 (2005)

(quoting *First English Evangelical Lutheran Church of Glendale v. County of Los Angeles,* 482 U.S. 304, 315 (1987) (emphasis in original)).

98.     The Takings Clause bars government actors "from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States,* 364 U.S. 40, 49 (1960).

99.     The Supreme Court "recognized that government regulation of private property may, in some instances, be so onerous that its effect is tantamount to a direct appropriation or ouster— and that such 'regulatory takings' may be compensable under the Fifth Amendment." *Lingle*, 544 U.S. at 537. "The general rule at least is that while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking." *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 415–16 (1922).

100.     The United States government's plan to release $7 billion of blocked Iranian assets, thereby circumventing the judgments of Plaintiffs and other terror-victim judgment-creditors of Iran, "goes too far" and must "be recognized as a taking." *See id.*

101.     Otherwise, without just compensation guaranteed by the Takings Clause, Plaintiffs and other terror-victim judgment-creditors of Iran will be privately saddled with the cost of paying for government action supposedly undertaken for the common good.

102.     The Supreme Court's analysis in *Penn Central* sets forth the framework for assessing whether government action is considered a regulatory taking, identifying "several factors that have particular significance." *Penn Central Transp. Co. v. New York City,* 438 U.S. 104, 124 (1978).

103.     Under the framework articulated by the Supreme Court in *Penn Central*, Defendants' actions constitute a taking based upon "the magnitude of…economic impact and the

degree to which [the action]…interferes with legitimate property interests." *Lingle*, 544 U.S. 528 at 540.

104.    The court looks to three factors when analyzing a taking: (1) "[t]he economic impact of the regulation on the claimant," (2) "the extent to which the regulation has interfered with distinct investment-backed expectations," and (3) "the character of the governmental action," *Penn Cent.,* 438 U.S. at 124, 98 S.Ct. 2646. While these factors provide "important guideposts," "[t]he Takings Clause requires careful examination and weighing of all the relevant circumstances." *Palazzolo,* 533 U.S. at 634, 636, 121 S.Ct. 2448 (O'Connor, J., concurring); *see also Tahoe–Sierra,* 535 U.S. at 321, 122 S.Ct. 1465 (whether a taking has occurred "depends upon the particular circumstances of the case"); *Yee v. City of Escondido,* 503 U.S. 519, 523, 112 S.Ct. 1522, 118 L.Ed.2d 153 (1992) (regulatory takings claims "entail[] complex factual assessments"). *Lost Tree Vill. Corp. v. United States*, 115 Fed. Cl. 219, 228 (2014) (emphasis added).

105.    By reason of the foregoing, Plaintiffs are entitled to a judgment against Defendants in the amount of their outstanding judgments against Iran.

### COUNT IV
### Substantive Due Process
### Interference with property interests

106.    The allegations set forth in the preceding paragraphs are incorporated by reference as though fully set forth herein.

107.    Defendants' stated intention of releasing $7 billion to Iran, despite Iran's enmity for the United States and everything the United States stands for, and despite the thousands of Americans who have obtained judgments against Iran in courts of the United States for Iran's heinous acts of terrorism, places inordinate and unreasonable demands on those judgment-creditors, expecting them to privately shoulder the burden for the rest of the country.

108.    The Plaintiffs have a protected liberty interest in their right to live without arbitrary governmental interference in their property rights to enforce their judgments against blocked assets as Congress has directed.

109.    The Supreme Court "ha[s] emphasized time and again that "[t]he touchstone of due process is protection of the individual against arbitrary action of government[.]" *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 845 (1998) (quoting *Wolff v. McDonnell,* 418 U.S. 539, 558 (1974)).

110.    "[T]he fault [may] lie[] in a denial of fundamental procedural fairness…or in the exercise of power without any reasonable justification in the service of a legitimate governmental objective[.]" *Id*. at 845-846 (citations omitted).

111.    ""[S]ubstantive due process' prevents the government from engaging in conduct that 'shocks the conscience,'…or interferes with rights 'implicit in the concept of ordered liberty[.]'" *United States v. Salerno,* 481 U.S. 739, 746 (1987) (quoting *Rochin v. California,* 342 U.S. 165, 172 (1952), and *Palko v. Connecticut,* 302 U.S. 319, 325–326 (1937)).

112.    "[T]he substantive component of the Due Process Clause is violated by executive action only when it can properly be characterized as arbitrary, or conscience shocking, in a constitutional sense." *Lewis*, 523 U.S. at 847 (quotations omitted).

113.    The United States' government stated intention to cooperate with Iran, the world's most prolific state sponsor of terrorism and worst judgment scofflaw, to circumvent the judgments of Plaintiffs and the thousands of other terror-victim judgment-creditors of Iran, constitute arbitrary, capricious, irrational and abusive conduct which unlawfully interferes with Plaintiffs' liberty and property interests protected by the due process clause of the Fifth and Fourteenth Amendment to the United States Constitution and forces them to privately bear the burden for such publicly beneficial decisions.

114.    The United States government's behavior does not comport with traditional ideas of fair play and decency, *Breithaupt v. Abram,* 352 U.S. 432, 435 (1957), and shocks the conscience and violates the 'decencies of civilized conduct.'" *See Lewis*, 523 U.S. 833, 846–47 (citations omitted); and violates Plaintiffs' Substantive Due Process Rights.

115.    As a direct and proximate result of the United States government's intended actions have and will continue to sustain monetary damages.

116.    By reason of the foregoing, Plaintiffs are entitled to a judgment against Defendants in the amount of their outstanding judgments against Iran.

## JURY TRIAL DEMANDED

117.    Plaintiffs demand a trial by jury of all issues which are triable to a jury.

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiffs demand judgment as follows:

(a)    Enjoining Defendants from releasing any sanctions with respect to Iran or the Central Bank of Iran until the Plaintiffs' judgments are satisfied in full;

(b)    By reason of Defendants' affirmative and deliberate acts of circumventing Plaintiffs' judgments, awarding Plaintiffs a judgment against Defendants for the full outstanding amount of their judgments;

(c)    Awarding Plaintiffs their costs and reasonable attorneys' fees in prosecuting this action; and

(d)    Ordering such other relief as the Court may deem just and proper.

Dated: September 5, 2023
      Brooklyn, New York

                                        Respectfully submitted,

                                        THE BERKMAN LAW OFFICE, LLC
                                        *Attorneys for the Plaintiffs*[*]

                                        By:_____
                                          Robert J. Tolchin

                                        829 East 15th Street, Box 7
                                        Brooklyn, New York 11230
                                        (718) 855-3627

---

[*] Plaintiff's counsel is assisted in this matter by Plaintiffs' Israeli counsel, who are not admitted to practice before this Court.
      NITSANA DARSHAN-LEITNER & CO.
      Nitsana Darshan-Leitner
      10 Hata'as Street
      Ramat Gan, 52512 Israel
      Israeli #: 011-972-523-837-020
      U.S. #: 212-591-0073